```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - -X
POPE INVESTMENTS II, LLC, JAYHAWK PRIVATE
EQUITY FUND, L.P., GUERILLA PARTNERS,
L.P., ALDER OFFSHORE MASTER FUND, L.P.,
PARAGON CAPITAL, L.P., DAYBREAK SPECIAL
SOLUTIONS MASTER FUND, LTD., AAMAXEN
TRANSPORT GROUP, INC., ASIA BUSINESS
MANAGEMENT GROUP, LTD., and SHANGHAI
ANHANTE (BEIJING) MEDICAL TECHNOLOGY
CO., LTD.,
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8-15-2012

                        Plaintiffs,           10 Civ. 6608 (LLS)

            - against -                       OPINION AND ORDER

DEHENG LAW FIRM and HELEN LV,

                        Defendants,
- - - - - - - - - - - - - - - - - - - - - - -X

Plaintiffs' first amended complaint in this action did not allege with particularity that these and other defendants acted with scienter in committing the alleged securities fraud. The Court dismissed that claim under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u-4(b)(3)(A), declined to exercise supplemental jurisdiction over plaintiffs' state law claims, and granted plaintiffs leave to replead. See Pope Invs. II LLC v. Deheng Law Firm, 10 Civ. 6608 (LLS), 2011 WL 5837818 (S.D.N.Y. Nov. 21, 2011).

Plaintiffs now bring a second amended complaint; however, it lies against only Deheng Law Firm and Helen Lv, a former partner at Deheng.

Deheng moves to dismiss the second amended complaint, arguing that its additional allegations do not sufficiently allege Deheng's scienter and thus do not cure the first amended complaint's defects. Deheng incorporates by reference its arguments asserted in its motion to dismiss the amended complaint – that Deheng is not subject to personal jurisdiction in New York, that Deheng was never served with process in this action, and that plaintiffs fail to state a claim upon which relief can be granted – which were unnecessary for the Court to reach in its prior opinion. And, for the first time, Deheng invokes the Supreme Court's recent decision in <u>Morrison v. National Australia Bank Ltd.</u>, 130 S. Ct. 2869 (2010), and argues that since the securities transaction giving rise to the alleged fraud did not take place in the United States but in China, plaintiffs cannot obtain relief under section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder.[1]

---

[1] Section 10(b) makes unlawful, "in connection with the purchase or sale of any security," the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission [i.e., the Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Under Rule 10b-5, 17 C.F.R. § 240.10b-5,

> It shall be unlawful for any person, directly or indirectly, by the use of any mans or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make an untrue statement of material fact or omit to state

## Background

### The SMT Transactions

The alleged fraud arises out of a transaction designed to acquire a Chinese company. The opinion dismissing the first amended complaint summarized those transactions:

> Plaintiffs Pope Investments II LLC, Jayhawk Private Equity Fund, L.P., Guerilla Partners, L.P., Alder Capital Partners I, L.P., Alder Offshore Master Fund, L.P., Paragon Capital, L.P., and Daybreak Special Situations Master Fund, Ltd. (collectively, the "Investors" or the "AAXT Investors"), who are entities organized or operating in the United States, sought to acquire Shanghai Atrip Medical Technology Co., Ltd. ("SMT"), a Chinese medical distribution company.
>
> The Investors "utilized a common corporate investment structure for non-Chinese investors that invest in Chinese companies," which required that three simultaneous transactions be executed on April 14, 2008 (the "SMT Transactions"). Plaintiff Aamaxen Transport Group, Inc. ("AAXT") acquired plaintiff Asia Business Management Group, Ltd. ("ABM") and its wholly owned subsidiary, plaintiff Shanghai Anhante (Beijing) Medical Technology Co., Ltd. ("Anhante"). Anhante simultaneously contracted to purchase SMT, and the Investors purchased shares in AAXT in order to acquire an ownership interest in SMT. The precise mechanics of the SMT Transactions are as follows:
>
> AAXT transferred 16,607,143 of its shares to Kamick Assets Limited, a company wholly owned by Shao, in exchange for Kamick's wholly owned subsidiary ABM and ABM's wholly owned subsidiary Anhante. (ABM, AAXT, and Anhante are referred to collectively as the "Group.")
>
> The Investors purchased 4,008,188 shares of AAXT

---

a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

3

> (the "AAXT Investment") for $12.5 million. The net proceeds of that transaction were deposited into ABM's bank account.
>
> Anhante contemporaneously contracted with SMT to transfer the net proceeds of the AAXT Investment to SMT in exchange for "substantially all of" SMT's "economic benefits and liabilities."
>
> Upon the closing of the AAXT Investment, Chen Zhong ("Chen"), the principal owner of SMT, became Chairman and CEO of AAXT. He was also granted a call option, which allowed him to purchase all outstanding Kamick stock from Shao over a two-year period if SMT met certain targets.

Pope Invs., 2011 WL 5837818, at *1-2 (all quotations from first amended complaint; citations omitted).

AAXT is a Delaware corporation with its principal place of business in China. Although AAXT's stock is sold on the Over-the-Counter Bulletin Board ("OTCBB"), Second Am. Compl. ¶ 18, the AAXT Investors purchased their shares in AAXT through a private placement transaction, see AAXT Form SC 14F1, Apr. 11, 2008, Rubenstein Decl. Ex. H. Plaintiffs do not allege that any of the stock transferred in the SMT Transactions was sold on a securities or over-the-counter exchange.

### Deheng and Lv

Deheng "is a global partnership headquartered in Beijing, PRC [i.e., People's Republic of China], with branches in locations around the world including New York, New York." Second Am. Compl. ¶ 11.

"Deheng represented the Group and SMT as legal counsel in

4

connection with the SMT Transactions." Id. ¶ 41. "Lv was one of the lead Deheng attorneys assigned by Deheng to represent the Group in connection with the SMT Transactions." Id. ¶ 42.

"Deheng took a primary role in structuring the SMT Transactions. Deheng drafted the Securities Purchase Agreement, the China Control Agreement and other transaction documents used in the SMT Transactions (the 'Transaction Documents')." Id. ¶ 44. Deheng further "advised the Group and SMT on the form and substance of contractual agreements necessary" to consummate the transaction and "regarding the legality and validity of the Investment Structure." Id. ¶ 45.

> 47. Deheng drafted a confidential legal opinion addressed to the Group and SMT ("Deheng Legal Opinion"), including each AAXT Investor and other investors listed on the Securities Purchase Agreement for AAXT concerning: (1) the legal ownership structure of the companies; (2) the legality and validity of the restructuring agreements; (3) and the transaction structure by which the AAXT Investors were to invest money in AAXT to receive and investment interest in SMT through . . . Anhante. . . .
>
> 48. The Deheng Legal Opinion was intended to be used and was in fact used to induce the AAXT Investors to invest in the Group and SMT.

"Deheng earned an uncertain amount of fees in connection with the SMT Transactions." Id. ¶ 52.

### The Alleged Fraud

"At some time during 2007, Shao consulted with Lv at Deheng regarding his intention to embezzle the money invested by the

AAXT Investors in AAXT away from the Group." Id. ¶ 32. Although Shao and Lv were married to each other, they never disclosed that fact to the AAXT Investors or the Group.

"Shao and Kamick were supposed to be the nominees of but not have any control over ABM. Chen was supposed to have control over ABM as CEO of AAXT." Id. ¶ 28. However, "Shao retained control over ABM's accounts," id. ¶ 32, and eventually stole the proceeds of the AAXT Investment, which had been deposited in ABM's bank accounts:

> 38. Shao, Kamick, Lv and/or Deheng misappropriated most or all of the AAXT Investment without the consent of the AAXT Investors and in blatant violation of the Transaction Documents between the parties, based on Deheng's advice. On information and belief, on the advice of Deheng, Shao and/or Kamick diverted that money into Shao's own personal bank accounts in his name, other entity accounts controlled by Shao, and also into at least one account controlled by Lv.
>
> 39. The funds which Shao embezzled have since been dissipated through hundreds of ATM withdrawals in the PRC and Hong Kong, wire transfer to other entities, and other purchases. A portion of the embezzled funds were transferred directly to Jerga Management Limited, a company in which Lv of Deheng acts as a director and has an express financial interest. In this way, Lv, as a partner of Deheng, benefitted directly from the fraud itself.

The AAXT Investors' subsequent investigation revealed "that the vast majority of the stolen money was transferred into bank accounts controlled by Shao and Deheng law partner Lv." Id. ¶ 40.

The AAXT Investors and the Group each allege one count of

securities fraud:

> 77. By representing that defendants were providing advice for the AAXT Investors' investment in SMT through the purchase of shares in AAXT, by falsely representing that Shao would not be able to control the invested funds, and also by advising Shao to misappropriate the investment funds away from SMT and failing to warn the AAXT Investors that such were Shao's intentions, defendants engaged in an act, practice, or course of business that operated as a fraud or deceit upon the AAXT Investors in connection with the purchase of a security.
>
> . . . .
>
> 95. By representing that defendants were providing advice for the Group's investment in SMT, by advising Shao and Lv to misappropriate the investment funds away from SMT, by advising Shao and Lv to misappropriate the investment funds away from SMT, by falsely representing that Shao would cede control over ABM to Chen and failing to warn AAXT of Shao's control over ABM's bank accounts and the risk of such misappropriation, and by falsely representing that defendants had fully vetted Kamick and Shao, defendants engaged in an act, practice, or course of business that operated as a fraud or deceit upon the Group in connection with the purchase of a security.

Plaintiffs also plead various common-law claims and allege that they fall within the Court's supplemental jurisdiction.

## Discussion

"When reviewing a motion to dismiss, a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009) (internal quotation marks omitted). "To survive

7

a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

### The Securities Fraud Claims

Deheng argues that plaintiffs do not state a claim upon which relief can be granted for securities fraud, because their allegations are "based in their entirety on alleged fraudulent conduct outside the United States and, for that reason," section 10(b) does not apply. Deheng's Br. 4, citing Morrison, 130 S. Ct. at 2888.

Plaintiffs counter that Morrison is inapposite, since "the fraud at issue in this case originated when defendant Deheng, through its agent Helen Lv, convinced plaintiffs (American investors) to invest in an American company, AAXT, whose stock is listed on the domestic OTC Bulletin Board," and since "the fraud was perpetrated in part by way of documents filed pursuant to the Securities and Exchange Act of 1934 and Rule 14F-1." Pls.' Opp'n Br. 3.

### A.

Before the Supreme Court's decision in Morrison, courts in this Circuit employed the "conduct" and "effects" tests to determine whether a plaintiff could properly bring a section

10(b) claim based on an extraterritorial securities transaction. Those tests "looked at two factors: (1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." SEC v. Berger, 322 F.3d 187, 192 (2d Cir. 2003), overruled by Morrison, 130 S. Ct. 2869.

In Morrison, the Supreme Court noted the "'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" 130 S. Ct. at 2877, quoting EEOC v. Arabian Am. Oil Co. (Aramco), 499 U.S. 244, 248 (1991). Finding no basis in the Exchange Act for the application of section 10(b) to foreign transactions, the Court rejected the "conduct" and "effects" tests, and instead adopted a "transactional test". Morrison, 130 S. Ct. at 2886. Thus, "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." Id. at 2888.[2]

1.

---

[2] Rule 10b-5 "was promulgated under § 10(b), and 'does not extend beyond conduct encompassed by § 10(b)'s prohibition.' United States v. O'Hagan, 521 U.S. 642, 651 (1997). Therefore if § 10(b) is not extraterritorial, neither is Rule 10b-5." Morrison, 130 S. Ct. at 2881. Thus, the discussion of plaintiffs' section 10(b) claims in this Opinion and Order applies equally to their claims under Rule 10b-5.

9

Plaintiffs argue that because AAXT's shares are sold on the domestic OTCBB, Morrison does not preclude their section 10(b) claims.

"The OTCBB is an interdealer electronic quotation system that displays real-time quotes, last-sale prices, and volume information for many domestic over-the-counter equity securities that are not listed on the NASDAQ stock exchange or a national securities exchange. Broker-dealers can use the OTCBB to look up prices or enter quotes for over-the-counter securities." SEC v. Ficeto, 839 F. Supp. 2d 1101, 1104 n.4 (C.D. Cal. 2011).

The Court in Morrison did not specify whether transactions on "an American stock exchange" include transactions on over-the-counter markets such as the OTCBB. In Ficeto, 839 F. Supp. 2d at 1112, the court concluded "that the Supreme Court did not purport to overturn the universally accepted principle that § 10(b) applies with equal force to market manipulation on national exchanges and the domestic over-the-counter market."

Plaintiffs, however, do not allege market manipulation, or that any transaction in this case took place on a domestic securities exchange or over-the-counter market. They allege only that AAXT's shares are quoted on the OTCBB.

As courts in this District have held, alleging merely that a company's shares are listed on a domestic exchange does not sufficiently plead that plaintiffs engaged in a domestic

10

securities transaction and thus does not bring the alleged fraud within section 10(b)'s coverage:

> . . . Plaintiffs' listing theory relies on the Court's statement, repeated several times throughout the opinion, that § 10(b) applies to securities "listed on a domestic exchange." Morrison, 130 S. Ct. at 2886. Plaintiffs, however, ignore the passages surrounding these statements in which the Court makes clear that its concern was with respect to the location of the securities transaction and not the location of an exchange where the security may be dually listed:
>
>> [W]e think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to "regulate"; it is parties or prospective parties to those transactions that the statute seeks to "protec[t]." And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.
>
> Id. at 2884 (internal citations omitted). In this passage, the Court makes clear that § 10(b) applies only to "purchase-and-sale transactions" that are executed "in the United States" and not to all securities that happen to be cross-listed on an American exchange. Indeed, it is "the primacy of the domestic exchange" to the Exchange Act as a whole that provides the context for the Court's analysis. Id.

In re UBS Sec. Litig., No. 07 Civ. 11225 (RJS), 2011 U.S. Dist. LEXIS 106274, at *14-15 (S.D.N.Y. Sept. 13, 2011) (brackets and

11

emphasis in UBS); see In re Alstom SA Sec. Litig., 741 F. Supp. 2d 469, 473 (S.D.N.Y. 2010) ("That the transactions themselves must occur on a domestic exchange to trigger application of § 10(b) reflects the most natural and elementary reading of Morrison."). Thus, the AAXT Investors' purchase of AAXT shares by a private placement is not a domestic transaction unless the sales transaction took place in the United States.

In UBS and Alstom, the plaintiffs purchased stock in foreign companies that cross-listed their shares on the New York Stock Exchange and foreign exchanges. Here, AAXT is a Delaware corporation which lists its shares only on the OTCBB. That distinction, however, does not compel a different result. As UBS and Alstom hold, Morrison's focus is on the transaction's location, not the parties' citizenship. See, e.g., Alstom, 741 F. Supp. 2d at 472-73 ("the Court was concerned with the territorial location where the purchase or sale was executed and the securities exchange laws that governed the transaction"). Under Morrison, the Court must look to where the securities transaction occurred to determine whether section 10(b) applies.

Therefore, plaintiffs do not plead a domestic securities transaction by alleging that AAXT lists its shares on the domestic OTCBB.

2.

The Court must then determine whether plaintiffs have pled

12

facts sufficient to create a plausible inference that the securities transaction occurred in the United States.

In Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 67-68 (2d Cir. 2012), the Court of Appeals set forth a test for determining where a securities transaction occurs when plaintiffs do not allege that the securities were purchased on a domestic exchange:

> Our decision in Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876 (2d Cir. 1972) also lends support to the notion that a securities transaction occurs when the parties incur irrevocable liability. In that case, we held that in the context of a civil trial brought pursuant to Rule 10b-5, the district court correctly instructed the jury that "the time of a 'purchase or sale' of securities within the meaning of Rule 10b-5 is to be determined as the time when the parties to the transaction are committed to one another." Id. at 891. "'Commitment' is a simple and direct way of designating the point at which, in the classic contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." Id.
>
> Given that the point at which the parties become irrevocably bound is used to determine the timing of a purchase and sale, we similarly hold that the point of irrevocable liability can be used to determine the locus of a securities purchase or sale.  Thus, in order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States:  that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security.

The court did "not believe this is the only way to locate a securities transaction," and held that "a sale of securities can be understood to take place at the location in which title is transferred." Absolute Activist, 677 F.3d at 68. "Accordingly, to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange, we hold that a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." Id.

In this case, plaintiffs allege that the AAXT Investors "collectively invested approximately $12.5 million in AAXT pursuant to a Securities Purchase Agreement dated April 14, 2008 in exchange for 4,008,188 shares of AAXT's Series A Senior Convertible Preferred Stock." Second Am. Compl. ¶ 19.

Plaintiffs do not allege facts creating a plausible inference that the AAXT Investors incurred irrevocable liability to purchase the shares within the United States: they allege that Deheng drafted the Securities Purchase Agreement, presumably in China, and they do not allege where that agreement was negotiated or signed. The Court therefore cannot determine from the allegations where a "commitment" or "meeting of the minds" occurred.

By arguing that section 10(b) applies to their claims because the securities transactions involved domestic purchasers

14

and sellers, plaintiffs ask the Court to look to where the effects of that transaction will be felt rather than to where the transaction occurred. That would require application of the "effects" test, which the Supreme Court has rejected. See Morrison, 130 S. Ct. at 2881. Thus, "a party's residency or citizenship is irrelevant to the location of a given transaction." Absolute Activist, 677 F.3d at 70.

Plaintiffs alternatively contend that the transaction was domestic because AAXT filed a Rule 14F-1 statement with the SEC to notify it of a change in a majority of its directors, and that "the fraud was perpetrated in part by way of" that filing. Pls.' Opp'n Br. 3. Implicit in that argument is the notion that because section 10(b) proscribes "any manipulative or deceptive device or contrivance," applying it to punish fraud that occurred in the United States is not an extraterritorial application.

However, the Supreme Court addressed that issue in Morrison and held that it is not the location of the fraud but the location of the securities transaction that defines whether section 10(b) applies:

> Petitioners argue that the conclusion that § 10(b) does not apply extraterritorially does not resolve the case. They contend that they seek no more than domestic application anyway, since Florida is where HomeSide and its senior executives engaged in the deceptive conduct of manipulating HomeSide's financial models; their complaint also alleged that Race and

15

> Hughes made misleading public statements there. This is less an answer to the presumption against extraterritorial application than it is an assertion – a quite valid assertion – that the presumption here (as often) is not self-evidently dispositive, but its application requires further analysis. For it is a rare case of prohibited extraterritorial application that lacks <u>all</u> contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever <u>some</u> domestic activity is involved in the case. . . . In <u>Aramco</u>, for example, the Title VII plaintiff had been hired in Houston, and was an American citizen. See 499 U.S., at 247. The Court concluded, however, that neither that territorial event nor the relationship was the "focus" of congressional concern, <u>id.</u>, at 255, but rather domestic employment. See also <u>Foley Bros.</u>, 336 U.S., at 283, 285-86.
>
> Applying the same mode of analysis here, we think that the focus of the Exchange Act is not upon the place where the deception originated, but upon the purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national security exchange or any security not so registered." 15 U.S.C. § 78j(b). . . .

130 S. Ct. at 2883-84 (emphasis in original) (parallel citations omitted). It is therefore "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies." <u>Id.</u> at 2884. Despite the deceptive conduct in the United States, the <u>Morrison</u> Court concluded: "This case involves no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still have live claims occurred outside the United States. Petitioners have therefore failed to

state a claim on which relief can be granted." Id. at 2888.

Therefore, plaintiffs' argument that section 10(b) applies here because the underlying fraud originated in the United States asks the court to use the now-defunct "conduct" test, and thus fails in light of Morrison. Cf. Cornwell v. Credit Suisse Grp., 729 F. Supp. 2d 620, 624 (S.D.N.Y. 2010) ("to carve out of the new rule a purchase or sale of securities on a foreign exchange because some acts that ultimately result in the execution of the transaction abroad take place in the United States amounts to nothing more than the reinstatement of the conduct test").

Plaintiffs plead no allegations regarding the transfer of title of AAXT's shares, and thus they do not create a plausible inference that title was transferred in the United States.

Accordingly, plaintiffs do not allege that the execution of the securities transaction giving rise to the purported fraud took place in the United States. Their securities fraud claims are therefore dismissed with leave to replead.

### The State Law Claims

The Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims, there being no independent basis for this Court's jurisdiction over those claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to

exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction."). Those claims are therefore dismissed.

### Leave to Replead

Because plaintiffs' securities fraud claims are dismissed for reasons not raised in any of the motions to dismiss the first amended complaint, plaintiffs are granted leave to replead by filing a third amended complaint within 30 days of this Opinion and Order.

### The Belmont Motion

Belmont Partners, LLC, Rosewood Securities, LLC, and Joseph Meuse, each named a defendant in the first amended complaint, filed a motion to dismiss the second amended complaint, apparently unaware that they are no longer named as defendants. That motion is denied as moot.

### Conclusion

Deheng's motion to dismiss the second amended complaint (Dkt. No. 107) is granted, with leave to replead within 30 days. The Belmont Motion (Dkt. No. 102) is denied as moot.

So ordered.

Dated:   New York, New York
         August 15, 2012

*Louis L. Stanton*
Louis L. Stanton
U.S.D.J.